No. 24-3868

# UNITED STATES COURT OF APPEALS
# FOR THE SIXTH CIRCUIT

———————

DAYTON AREA CHAMBER OF COMMERCE; OHIO CHAMBER OF COMMERCE; MICHIGAN CHAMBER OF COMMERCE; CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA,

*Plaintiffs-Appellants*,

v.

ROBERT F. KENNEDY, JR., in his official capacity as Secretary of the US Department of Health and Human Services; UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; STEPHANIE CARLTON, in her official capacity as Acting Administrator of the Centers for Medicare and Medicaid Services; CENTERS FOR MEDICARE AND MEDICAID SERVICES,

*Defendants-Appellees*.

———————

On Appeal from the United States District Court for the Southern District of Ohio, No. 3:23-cv-00156, Hon. Michael J. Newman

———————

## REPLY BRIEF FOR APPELLANTS

———————

Jennifer B. Dickey
Andrew R. Varcoe
U.S. CHAMBER
LITIGATION CENTER
1615 H Street NW
Washington, DC 20062
(202) 463-5337

*Counsel for the Chamber of Commerce of the United States of America*

Jeffrey S. Bucholtz
Alexander Kazam
Christine M. Carletta
E. Caroline Freeman
KING & SPALDING LLP
1700 Pennsylvania Avenue NW
Washington, DC 20006
(202) 737-0500
jbucholtz@kslaw.com

*Counsel for Plaintiffs-Appellants*

March 14, 2025                    *(Additional counsel listed on inside cover)*

Tami H. Kirby
PORTER WRIGHT MORRIS
& ARTHUR LLP
One South Main Street
Suite 1600
Dayton, OH 45402
(937) 449-6721

*Counsel for Plaintiffs-Appellants*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................ii

INTRODUCTION ............................................................................1

ARGUMENT ..................................................................................4

I.    Plaintiffs have standing to bring this lawsuit to protect their members' interests .................................................4

    A.    The interests relevant to the germaneness inquiry are not limited to Article III injuries-in-fact...........................4

    B.    This challenge to the government's unconstitutional price controls is germane to the Dayton Area Chamber's purposes .............................................12

    C.    Plaintiffs' claims do not require the participation of individual members .............................................20

    D.    The Ohio and Michigan Chambers also have standing ...................................................22

II.    If the Dayton Area Chamber had lacked standing, the district court should have transferred the case to the Eastern Division of the Southern District of Ohio ........................25

CONCLUSION ............................................................................29

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## Cases

*1st of Mich. Corp. v. Bramlet,*
 141 F.3d 260 (6th Cir. 1998)................................................................26

*Ariz. Christian Sch. Tuition Org. v. Winn,*
 563 U.S. 125 (2011) ................................................................10

*Ass'n of Am. Physicians & Surgeons v. FDA,*
 13 F.4th 531 (6th Cir. 2021) ................................................................22

*Bldg. & Constr. Trades Council v. Downtown Dev., Inc.,*
 448 F.3d 138 (2d Cir. 2006) ................................................................6

*Chamber of Commerce v. Consumer Fin. Prot. Bureau,*
 2024 WL 5012061 (N.D. Tex. Dec. 6, 2024) ......................................12

*Children's Health Def. v. FDA,*
 2022 WL 2704554 (6th Cir. July 12, 2022) ................................7, 8, 19

*Clapper v. Amnesty Int'l USA,*
 568 U.S. 398 (2013) ................................................................6

*Cleveland Branch, N.A.A.C.P. v. City of Parma,*
 263 F.3d 513 (6th Cir. 2001)................................................................14

*Ctr. for Sustainable Econ. v. Jewell,*
 779 F.3d 588 (D.C. Cir. 2015) ................................................................4, 9

*FDA v. All. for Hippocratic Med.,*
 602 U.S. 367 (2024) ................................................................18, 21

*FEC v. Cruz,*
 596 U.S. 289 (2022) ................................................................14

*Goldlawr, Inc. v. Heiman,*
 369 U.S. 463 (1962)................................................................25, 28

*Heartwood, Inc. v. Agpaoa,*
 628 F.3d 261 (6th Cir. 2010)................................................................10

*Humane Soc'y v. Hodel*,
   840 F.2d 45 (D.C. Cir. 1988) ................................................................5

*Hunt v. Wash. State Apple Advert. Comm'n*,
   432 U.S. 333 (1977) ...................................................................... 4, 11

*Memphis A. Philip Randolph Inst. v. Hargett*,
   2 F.4th 548 (6th Cir. 2021) ...................................................................4

*Minn. Fed'n of Teachers v. Randall*,
   891 F.2d 1354 (8th Cir. 1989) ...............................................................9

*Nat'l Infusion Ctr. Ass'n v. Becerra*,
   116 F.4th 488 (5th Cir. 2024) .............................................................14

*Nw. Bldg. Components, Inc. v. Adams*,
   2022 WL 1689293 (D. Colo. May 26, 2022) ........................................28

*Online Merchs. Guild v. Cameron*,
   995 F.3d 540, 549 (6th Cir. 2021) ........................................................12

*Pac. Nw. Generating Coop. v. Brown*,
   38 F.3d 1058, 1061 (9th Cir. 1994) .......................................................8

*Proctor v. Morrissey*,
   97 F.3d 1448, 1996 WL 555302 (4th Cir. 1996) .................................27

*Prospect Cap. Corp. v. Bender*,
   2009 WL 4907121 (S.D.N.Y. Dec. 21, 2009) ......................................28

*Speech First, Inc. v. Whitten*,
   604 U.S. ___, 2025 WL 663689 (Mar. 3, 2025) ...................................21

*Stanifer v. Brannan*,
   564 F.3d 455 (6th Cir. 2009) ........................................................26, 27

*Summers v. Earth Island Inst.*,
   555 U.S. 488 (2009) ..............................................................................6

*Warth v. Seldin*,
   422 U.S. 490 (1975) ............................................................................15

*White's Place, Inc. v. Glover*,
    222 F.3d 1327 (11th Cir. 2000)............................................................8

**Statutes**

28 U.S.C. § 1391(e)(1) .....................................................................19

28 U.S.C. § 1406............................................................................25, 27

**Other Authorities**

Dayton Area Chamber of Com.,
    *Business Advocacy*, https://tinyurl.com/mrhdmw52..........................16

Dayton Area Chamber of Com.,
    *Dayton Area Chamber Invited to*
    *White House for National Workforce Summit*
    (Dec. 13, 2019), https://tinyurl.com/4j7d5nd8..................................16

Kershner, Chris,
    Dayton Area Chamber of Com., *Proposal to Ban*
    *Noncompete Agreements Illegal*, Dayton Daily News
    (Jan. 29, 2023), https://tinyurl.com/hxdc975m ................................16

Ohio Chamber of Com.,
    *Legislative Priorities: Energy & Environment* (2025),
    https://ohiochamber.com/legislative-priorities/ ................................24

Ohio Chamber of Com.,
    *Vision, Mission & Values* (2025),
    https://ohiochamber.com/about-us/mission/.......................................23

Press Release,
    Ohio Chamber of Com., New Banking Rules
    Would Hurt Ohio Farmers and Manufacturers
    (May 13, 2024), https://tinyurl.com/4n5e7mwb ................................24

14D Wright & Miller,
    Federal Practice and Procedure Juris. § 3827 (4th ed.)..............25, 28

## INTRODUCTION

Unable to prevail under the governing three-part test for associational standing, the government continues its quest to rewrite that test. The district court's key error, Plaintiffs have explained, was to conflate two separate elements of the associational standing test. To satisfy the first element, an association must have at least one member that has suffered an Article III injury and thus would have standing to sue in its own right. The second element asks a different question: is the litigation germane to the association's purposes? The district court, however, imported an Article III injury analysis into the question whether a suit is germane to an association's purpose and as a result took an unjustifiably (and expressly) "narrow" view of the Dayton Area Chamber's interest. Opening Br. 35–41. That approach is flatly inconsistent with binding precedent from the Supreme Court and this Court.

In its response brief, the government doubles down on the district court's fundamental error. The government concedes that the first element is satisfied because (at a minimum) Pharmacyclics, a member of each of the Plaintiffs, would have standing to sue in its own right. *See*

Gov't Br. 1, 31. But the government bases its germaneness argument on the false notion that this suit is *solely* "on behalf of Pharmacyclics." *Id.* at 1. That false notion pervades the government's brief, starting with its very first sentence, *id.*, and recurring throughout, *see id.* at 2, 3, 18, 19, 21, 24, 30, 32, 38, 43 (using the same or similar formulations). And it leads the government to treat the interests of all of Plaintiffs' other members (both drug manufacturers and other interested members) as irrelevant.

That myopic framing of the interests at stake here is simply incorrect, and again inconsistent with governing case law on associational standing. The Dayton Area Chamber and the other Plaintiffs did not bring this suit "on behalf of" Pharmacyclics to the exclusion of the interests of their many other members. That Pharmacyclics is not based in Dayton does not mean that other members of the Dayton Area Chamber do not or should not care about this litigation. To the contrary, this litigation vindicates the interests of Plaintiffs' memberships writ large. For the Dayton Area Chamber, those interests include safeguarding the prosperity of the Dayton metropolitan region—an important commercial hub with a significant health care and

life sciences presence—against government policies, like the IRA's price-control program, that undermine free enterprise, investment, and economic growth. This suit is thus clearly related to the Dayton Area Chamber's purposes. The district court was not entitled to decide that the Dayton Area Chamber has no interest in national laws and policies, much less national laws and policies that have obvious local impacts. And because Plaintiffs' claims do not require the participation of individual members, there is no other obstacle to the Dayton Area Chamber's standing to bring this suit.

For much the same reason, the district court also erred in holding that the Ohio Chamber of Commerce and the Michigan Chamber of Commerce lacked standing.

This Court should follow established associational standing precedent and reverse and remand for the district court to consider the merits of Plaintiffs' claims.

## ARGUMENT

### I. Plaintiffs have standing to bring this lawsuit to protect their members' interests.

#### A. The interests relevant to the germaneness inquiry are not limited to Article III injuries-in-fact.

The Supreme Court has defined the second element of the associational standing test as whether "the interests [the organization] seeks to protect are germane to the organization's purpose." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). As that description makes clear, the focus of the germaneness inquiry is the general "interests at stake" in—*i.e.*, implicated by—the suit. *Memphis A. Philip Randolph Inst. v. Hargett*, 2 F.4th 548, 556 (6th Cir. 2021). Indeed, the government acknowledged in the district court that "the germaneness requirement mandates pertinence between *litigation subject* and organizational purpose." R.71 (Defs.' Combined Motion to Dismiss and Cross-Motion for Summ. J.), PageID#843 (emphasis added) (quoting *Ctr. for Sustainable Econ. v. Jewell*, 779 F.3d 588, 597 (D.C. Cir. 2015)). It does *not* require "germaneness of *members' injuries* to organizational purpose." *Ctr. for Sustainable Econ.*, 779 F.3d at 597 n.9 (emphasis added). "The difference is a significant one." *Id.* Yet while paying lip service to the "modest[y]" of the germaneness requirement,

4

Gov't Br. 22 (quoting *Humane Soc'y v. Hodel*, 840 F.2d 45, 57 (D.C. Cir. 1988)), the government repeats the district court's error of ignoring that key difference and narrowing the Dayton Area Chamber's "interests at stake" in the litigation to Pharmacyclics' Article III injuries. *See* Opening Br. 33–42.[1]

That critical error is perhaps most glaring in the government's complaint that Plaintiffs "did not plead and have not introduced any evidence" proving that the price-control program "will financially harm others in the supply chain" or will ensnare other members that may later be forced to "participate" in the program. Gov't Br. 34–35. If pleading and proving such facts were required for germaneness, courts would hardly be so uniform in recognizing the test as "undemanding." Opening Br. 26–27. The test would instead parallel (if not duplicate) the rigorous causation standard applicable to Article III's injury-in-fact requirement. Indeed, revealingly, the only published cases the government cites in this

---

[1] In further confining its view only to *Pharmacyclics'* injuries, the government implies that AbbVie would not have standing to sue because it is Pharmacyclics, AbbVie's subsidiary, that holds the new drug applications for IMBRUVICA®. Gov't Br. 12–13, 24 n.1. But the government ignores the injuries AbbVie has suffered in its own right, such as substantial compliance costs and the deprivation of procedural rights. *See* Opening Br. 21–23.

portion of its brief are injury-in-fact cases: they pertain to the *first* element of associational standing—whether a member would have Article III standing to sue in its own right—and not to the germaneness element. *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013); *Summers v. Earth Island Inst.*, 555 U.S. 488, 497–98 (2009).

The government cannot cite any authority importing such standards into the germaneness inquiry, and for good reason. A risk of future injury to Plaintiffs' members—even if too indirect or uncertain to satisfy the injury-in-fact requirement—can obviously make Plaintiffs' members interested in litigation that seeks to avert that risk. *See Bldg. & Constr. Trades Council v. Downtown Dev., Inc.*, 448 F.3d 138, 149 (2d Cir. 2006) (germaneness satisfied where success in the litigation would "reasonably tend to further the general interests that individual members sought to vindicate in joining the association"). Members involved in the pharmaceutical industry may reasonably anticipate that their drugs will likely be selected for "negotiation" in future years. Members with business interests adjacent or related to the pharmaceutical industry may anticipate that the IRA's price controls will likely harm them, too, even if less directly than the manufacturers of

6

drugs selected for "negotiation." And members in other industries may reasonably conclude that if the IRA's price controls are upheld, their industry may be next. In short, there is no basis in law or logic to pretend that only the named members with Article III injuries care about this litigation.

Apart from *Clapper* and *Summers* (which, as noted, are not germaneness cases), the government relies heavily on this Court's unpublished decision in *Children's Health Defense v. FDA*, 2022 WL 2704554 (6th Cir. July 12, 2022). There, this Court held that an organization that sought to "end childhood health epidemics" lacked associational standing for a suit that the organization described as pertaining to "the protection of military service member[s'] rights to refuse or consent to COVID vaccines." *Id.* at *1 n.1, *3 (cleaned up). The Court explained that "[t]he connection between a suit concerning the vaccination of adult military members and an organization committed to protecting children's health is too attenuated" to satisfy the germaneness element. *Id.* at *3. That "attenuat[ion]" referred not to a failure of proof, as the government implies, Gov't Br. 34, but to the clear "detach[ment]" between the subject of the litigation (mandatory vaccination of *adult*

military service members) and the organization's stated purpose (ending *childhood* health epidemics), 2022 WL 2704554, at *3.

Reaching farther afield, the government attempts to draw support for its new theory of germaneness from a few readily distinguishable out-of-circuit cases. *See* Gov't Br. 23, 33, 37. In *Pacific Northwest Generating Coop. v. Brown*, the Ninth Circuit held that a power-generation cooperative lacked standing to assert "its customers' aesthetic and recreational interests" in the salmon affected by the defendants' conduct. 38 F.3d 1058, 1061, 1063 (9th Cir. 1994), *as amended* (Sept. 28, 1994). To the extent the court relied on associational standing principles at all, it observed only that there was "nothing to show" that aesthetic or recreational concerns were germane to the cooperative's interests in power generation. *Id.* at 1063. In *White's Place, Inc. v. Glover*, 222 F.3d 1327 (11th Cir. 2000), the Eleventh Circuit held that a corporation whose purpose was "to present erotic dancing for profit" lacked associational standing to challenge an ordinance prohibiting resistance or opposition to police officers in the discharge of their duties. *Id.* at 1329–30. The court found it "difficult to discern how the normal conduct of the corporation's affairs will involve opposition to police officers." *Id.* Here, in contrast, it

is easy to discern why a regional business federation would be interested in challenging national legislation that imposes price controls on its members and undermines free enterprise across the country, including for sales in its region.

The government's reliance on *Minnesota Federation of Teachers v. Randall* is likewise misplaced. 891 F.2d 1354 (8th Cir. 1989) (per curiam). In *Minnesota Federation*, the Eighth Circuit held that a teachers' union lacked associational standing to challenge on Establishment Clause grounds a state statute that allocated funds to private post-secondary schools, including religiously affiliated schools, for high school students taking courses at those schools. *Id*. at 1355, 1359. The union attempted to assert associational standing on the basis that it had members who were taxpayers. *Id.* at 1358–59. But the union "[wa]s not an organization of taxpayers" and "[t]he fact that some or all of its members pay taxes [wa]s purely incidental," so the union could not establish germaneness. *Id.* at 1359. In other words, the problem was that the claim about constitutional limits on tax expenditures had nothing to do with the members' jobs as teachers, which was the focus of the union's mission. *Cf. Ctr. for Sustainable Econ.*, 779 F.3d at 597 n.9 (explaining that the

reason why a book club could not bring a tort suit on behalf of a member bitten by a dog is that "the litigation subject (a dog bite) would not be pertinent to the organization's purpose (reading and discussing books)"). By contrast, this litigation over the government's attempt to force manufacturers of lawful articles of commerce into a nationwide price-control program is clearly aligned with Plaintiffs' purposes.

Meanwhile, the government asks this Court to overlook the many cases Plaintiffs cited in which this Court easily found the germaneness requirement satisfied after briefly comparing the organization's stated mission to the general subject matter of the litigation—without limiting the germaneness inquiry to Article III injuries-in-fact. *See* Gov't Br. 41–43 & n.3. The government protests that germaneness was not "contested" by the parties in most of those decisions. *Id.* But the Court's fulfillment of its obligation to investigate jurisdictional issues, *see, e.g.*, *Heartwood, Inc. v. Agpaoa*, 628 F.3d 261, 266 (6th Cir. 2010), is no less precedential when exercised *sua sponte*. The principle that a decision that "neither noted nor discussed" a potential jurisdictional defect "does not stand for the proposition that no defect existed," Gov't Br. 42 (quoting *Ariz. Christian Sch. Tuition Org. v. Winn*, 563 U.S. 125, 144 (2011)), is

10

inapplicable to decisions that noted, discussed, and resolved jurisdictional questions. That germaneness was not contested by the parties in many of those cases—and that the Court did not need to "closely examine" germaneness to find that element satisfied, *see* Gov't Br. 43—only reinforces the point that germaneness is a modest and undemanding requirement. *See* Opening Br. 26–29.

The government's redefinition of germaneness is not only unsupported but, as Plaintiffs pointed out, inconsistent with Supreme Court, Sixth Circuit, and other precedent. *See id.* at 46–49. For example, the government has no response to Plaintiffs' argument that *Hunt* identified the interests at stake, for purposes of the germaneness requirement, as *both* the injuries-in-fact of specific members *and* "the industry's" broader agenda regarding its grading system. 432 U.S. at 344; *see* Opening Br. 37. Nor does it respond to environmental cases in which courts recognize that organizations' suits vindicate broad interests in addition to merely remedying particular injuries suffered by individuals. Opening Br. 37–38. And it does not explain how its insistence that the Court restrict its analysis to Article III injuries could be reconciled with the fact that many decisions—including this Court's binding precedent—

find the germaneness requirement satisfied *before* deciding whether the organization has a member that would have standing in its own right. *Id.* at 38–40; *see, e.g.*, *Online Merchs. Guild v. Cameron*, 995 F.3d 540, 549, 552 (6th Cir. 2021).

Finally, the government surprisingly ignores the remarkably on-point *Fort Worth Chamber* decision, which Plaintiffs discussed in their opening brief. *See* Opening Br. 28–29 (citing *Chamber of Commerce v. Consumer Fin. Prot. Bureau*, 2024 WL 5012061 (N.D. Tex. Dec. 6, 2024)). As Plaintiffs noted, the court there expressly disagreed with the decision below in this case, rejecting the government's cramped "geographic[]" conception of germaneness as inconsistent with Fifth Circuit precedent. *Id.* at 29 (quoting 2024 WL 5012061, at *4).

**B.    This challenge to the government's unconstitutional price controls is germane to the Dayton Area Chamber's purposes.**

Under a straightforward application of binding precedent, there can be no doubt that this challenge to the IRA's price-control program is germane to the purposes of the Dayton Area Chamber. The government strains to define both this suit and the Dayton Area Chamber's purposes as narrowly as possible. But on any fair assessment, there is obviously a

12

"meaningful connection," Gov't Br. 23, between this litigation and the association's stated aims.

To start, the government asserts that a district court's assessment of an organization's "purpose" is a factual determination and is therefore reviewed on appeal for clear error. *See id.* at 21, 25. This argument misses the point. It is undisputed that the Dayton Area Chamber's general mission is improving the region's business climate. R.102 (Final Order), PageID#1564; *see* Opening Br. 8–9. Indeed, the government has never contested that as "part of that mission, the Dayton Area Chamber supports a market-based reduction in prescription drug prices, but it opposes governmental actions that price set for private industry" or that the "Dayton Area Chamber advocates for a legal and political environment that will allow its members to compete in a free market to control costs." R.29-2 (Kershner Declaration), PageID#171 ¶ 6. The critical issue for this Court is whether those interests are germane to the purposes Plaintiffs seek to advance in this lawsuit. *See* Gov't Br. 23–24 (identifying the dispute on appeal as "the proper characterization of" the interests furthered by the litigation and "the sufficiency of their fit" with Plaintiffs' purposes). That issue raises a question of law regarding the

district court's application of associational-standing doctrine. "Whether a party has standing is a legal question reviewed de novo." *Cleveland Branch, N.A.A.C.P. v. City of Parma*, 263 F.3d 513, 523 (6th Cir. 2001).

From the government's narrow perspective, this lawsuit is merely about Pharmacyclics' "interest in the price at which it can sell drugs to Medicare, and the scope of its rights under that program." Gov't Br. 24–25. In adopting that reductive view, the government attempts to pass this case off as nothing more than a routine Medicare payment dispute. *Contra Nat'l Infusion Ctr. Ass'n v. Becerra*, 116 F.4th 488, 505 (5th Cir. 2024) (holding that a challenge to the IRA's price-control program was not merely a claim that Medicare providers "should be reimbursed a particular amount," but rather a claim "that the prices of drugs … should not be determined by allegedly unconstitutional government processes" that "set[] rules for the entire ecosystem" (cleaned up)).

The government's self-serving characterization of this suit all but ignores Plaintiffs' claims, which are central to the standing analysis. *See FEC v. Cruz*, 596 U.S. 289, 298 (2022) ("For standing purposes, we accept as valid the merits of [plaintiffs'] legal claims … ."); *see also Warth v.*

14

*Seldin*, 422 U.S. 490, 500 (1975) (noting that standing "often turns on the nature and source of the claim asserted").

Plaintiffs claim that the price-control program violates the separation of powers, deprives manufacturers of selected drugs of property without due process, permits the imposition of excessive fines, exceeds Congress's enumerated powers, and impermissibly compels speech. Opening Br. 24–25; *accord* Gov't Br. 14. The government waves away the principles on which those claims rest as "broad policy interests." Gov't Br. 25. But those broad policy interests form part of Plaintiffs' purpose in bringing the lawsuit. *See* Opening Br. 30–31, 35; *see also id.* at 40–41 (explaining that germaneness, unlike injury-in-fact, can be supported by "generalized" interests).

The government tries its best to pigeonhole the Dayton Area Chamber by highlighting its activities at the state and local level and emphasizing its goal of improving the business climate in "the Dayton region." *See* Gov't Br. 25–28. But the Dayton Area Chamber's regional focus does not preclude it from having an interest in national legislation that affects the Dayton region. On the contrary, common sense suggests that a regional chamber—especially one in a major metropolitan area—

15

must be attuned to national policy, because what happens in Washington, D.C., often has important implications for the whole country. And indeed, the Dayton Area Chamber's website proclaims its "unparalleled influence on the local, regional, state *and national* levels." Dayton Area Chamber of Com., *Business Advocacy*, https://tinyurl.com/mrhdmw52 (last visited Mar. 14, 2025) (emphasis added).

Consistent with that broad outlook, the Dayton Area Chamber was opining on national policies and federal legislation long before it filed this suit. *See, e.g.*, Dayton Area Chamber of Com., *Dayton Area Chamber Invited to White House for National Workforce Summit* (Dec. 13, 2019), https://tinyurl.com/4j7d5nd8 (discussing Dayton Area Chamber's invitation to attend national summit at White House regarding policies for family leave and child care affordability); Chris Kershner, Dayton Area Chamber of Com., *Proposal to Ban Noncompete Agreements Illegal*, Dayton Daily News (Jan. 29, 2023), https://tinyurl.com/hxdc975m (criticizing FTC proposed rule and identifying the Dayton Area Chamber's key initiatives for the next year as including being "a leader in advocating for business friendly policies at the local, state *and federal*

levels" (emphasis added)). In other words, the Dayton Area Chamber has clearly and repeatedly explained that its regional purpose, *see* Gov't Br. 9, includes protecting its members and the Dayton region from harmful national policies—which, after all, apply in the Dayton region no less than in the rest of the country. It has also explained how this litigation connects to that regional purpose. *See* Opening Br. 30–31. It is not for the government to redefine that purpose or to insist that the Dayton Area Chamber should not concern itself with radical new federal laws with far-reaching effects.

The government rightly concedes that "[l]ocally oriented organizations may of course represent their members in suits challenging federal laws or on matters of national policy when a suit is germane to the organization's actual purpose." Gov't Br. 39. But the government refuses to apply that principle to this case. Instead, the government analogizes this case to a suit by an organization "dedicated to preserving a park in Memphis" challenging a project that would destroy "a park in Brooklyn." *Id.* That the government would offer such an inapt analogy speaks volumes. Unlike a pair of physical parks separated by a thousand miles, the Dayton area economy and the national economy are deeply

17

interconnected and interdependent—indeed, the former is *part* of the latter. To state the obvious, federal price controls for drugs apply to drugs that are provided to patients in Dayton. And the supply-chain impacts of such price controls are ripple effects that reverberate in every corner of the country. *Cf. FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 384 (2024) (referring to "downstream or upstream economic injuries" that occur as a result of government regulation). Once again, the government is wrong to treat the Dayton area as an economic island. The region is home to 800,000 people and thousands of businesses large and small, including in the health care and pharmaceutical industries. *See* Opening Br. 32 & nn. 4–6.

Finally, the government complains that Plaintiffs' view of the germaneness requirement lacks a "limiting principle." Gov't Br. 38. Not so. The germaneness requirement is bounded by both the interests at stake in a lawsuit and an organization's purpose. When the subject of litigation is narrow, the range of organizations whose purposes are germane to that subject will be correspondingly limited—and when an organization's purpose is narrow, the range of litigation subjects germane to the organization will be correspondingly narrow. *See, e.g., Children's*

*Health Def.*, 2022 WL 2704554, at *3 (organization devoted to "childhood health epidemics"). While the Dayton Area Chamber (like the Ohio and Michigan Chambers, for that matter) is broadly focused on national, state, and local policies that affect the business climate in its region, it has an unmistakable focus on *business* interests. Price controls lie at the heartland of such interests.

The government protests that this suit could have been brought "in judicial districts in any of the eleven numbered circuits," Gov't Br. 46, if Pharmacyclics were a member of local chambers in all those circuits. As an initial matter, it should hardly be surprising or troubling that venue for a suit challenging a major new federal program with massive nationwide consequences could be proper in multiple fora across the country. The government may prefer to litigate in Washington, D.C., but the IRA is the law throughout the country, including in the Southern District of Ohio. And the general federal venue statute plainly allows litigants to sue the federal government in many fora. 28 U.S.C. § 1391(e)(1). The government has no authority to rewrite the statute to suit its sense of its own convenience. Moreover, contrary to the government's speculation, it is not true that every local chamber has

"similarly generalizable business interests." Gov't Br. 46. Different chambers have different memberships and missions. Even chambers with very similar memberships and missions may pursue different strategies for advancing those missions. In any event, the government's policy concerns are no basis for casting aside the Supreme Court's longstanding precedent and inventing a new germaneness test.

### C. Plaintiffs' claims do not require the participation of individual members.

Not satisfied with trying to refashion the germaneness requirement, the government also embraces the district court's novel reformulation of the third element of associational standing. Gov't Br. 48–49. The government renews its unsupported contention that, because some of Plaintiffs' members have filed separate suits challenging the IRA's price-control program, Plaintiffs' claims require the participation of individual members. Yet the Supreme Court and this Court have consistently held that individual participation is not required where, as here, a suit raises pure questions of law and seeks only declaratory or injunctive relief—not damages that necessitate individualized determinations. *See* Opening Br. 42–45. The district court did not cite a single case in which a court held that a suit seeking purely

prospective relief required individual-member participation, and the government likewise comes up empty-handed.

Moreover, like the district court, the government fails to explain why a separate suit brought by "one []other member" of an association, Gov't Br. 48, should jeopardize that association's right to pursue relief on behalf of its many members. As discussed above, the IRA's price-control program is of concern to Plaintiffs' memberships writ large, not only to pharmaceutical companies whose drugs have already been selected.

Without precedent on its side, the best the government can do is cite Justice Thomas's solo concurring opinion in *Alliance for Hippocratic Medicine*, 602 U.S. at 400–01, which questioned whether associational standing should exist. But as Justice Thomas himself recognized, the Supreme Court has "consistently applied" the doctrine and it remains good law. Opening Br. 42 (cleaned up); *see also Speech First, Inc. v. Whitten*, 604 U.S. ___, 2025 WL 663689, at *3 n.1 (Mar. 3, 2025) (Thomas, J., dissenting from denial of certiorari) (acknowledging that "under our precedents, an association … can establish standing to sue on behalf of its members"). As the panel acknowledged in *Association of American Physicians & Surgeons v. FDA*, lower courts have no license to change

the Court's "current test" for associational standing. 13 F.4th 531, 537 (6th Cir. 2021); *id*. at 547 (Siler, J., concurring). This Court should apply that well-established test and, to avoid the need for further piecemeal appeals, should hold that all Plaintiffs satisfy all three prongs.

### D.    The Ohio and Michigan Chambers also have standing.

Although the government did not challenge the germaneness element of associational standing with respect to the Ohio and Michigan Chambers below, the district court dismissed those Plaintiffs for lack of standing on the same misguided grounds on which the court dismissed the Dayton Area Chamber. The government now attempts to defend that ruling. As Plaintiffs have explained, however, the standing of the Ohio and Michigan Chambers is straightforward—and contrary to the government's suggestion, Gov't Br. 29, Plaintiffs' opening brief did more than enough to preserve their arguments on that point, *see* Opening Br. 9–10, 51–52. There is no dispute that "at least one member of each has standing," *id*. at 51, and as discussed above, Plaintiffs' claims do not require the individual participation of members, so the first and third elements of associational standing are satisfied. The government did not contest below, and does not make a serious effort to contest on appeal,

22

that the purposes of the Ohio and Michigan Chambers are germane to this lawsuit. *See id.* at 13. While selectively quoting from portions of the Ohio Chamber's website that focus on its activities at the state level, Gov't Br. 10, the government cannot explain why opposing federal legislation that the Ohio Chamber fears will undermine free enterprise in Ohio is somehow unrelated to the Ohio Chamber's stated mission of fostering "[a] growing and prosperous economic and business climate in Ohio" and "aggressively champion[ing] free enterprise, economic competitiveness, and growth for the benefit of all Ohioans."[2]

The government also ignores evidence in the record that confirms that the Ohio Chamber "'develops public policy positions on both state and federal matters,'" that it advocates for a "market-based health care system," and that it opposes heavy-handed "'government regulations'" that undermine innovation and investment "'in the health care space.'" Opening Br. 9, 51–52 (quoting R.29-4 (Long Declaration), PageID#181–82 ¶¶ 4, 6). The Ohio Chamber's website includes numerous examples of its attention to federal matters that affect Ohioans, from federal

---

[2] Ohio Chamber of Com., *Vision, Mission & Values* (2025), https://ohiochamber.com/about-us/mission/.

environmental regulations[3] to proposed federal banking regulations that, like the price controls challenged here, would affect "businesses vital to many local economies like Ohio's."[4]

The government similarly fails to rebut Plaintiffs' showing of germaneness with respect to the Michigan Chamber. *See* Opening Br. 52. The Michigan Chamber, which represents thousands of members that collectively employ more than 1 million people in a variety of industries, seeks to advance pro-business policies through "legislative, legal, and political action." R.29-3 (Holcomb Declaration), PageID#176 ¶ 4. As part of that mission, the Michigan Chamber "advocates for market-friendly, consumer driven reforms" to the health care system. *Id*. ¶ 6. It should be no surprise that the Ohio and Michigan Chambers view the IRA's price-control program, which applies with full force in Ohio and Michigan, as a threat to their core principles and policy priorities.

---

[3] *See, e.g.*, Ohio Chamber of Com., *Legislative Priorities: Energy & Environment* (2025), https://ohiochamber.com/legislative-priorities/ ("Work with the U.S. Chamber to protect against costly federal environmental regulations").

[4] Press Release, Ohio Chamber of Com., New Banking Rules Would Hurt Ohio Farmers and Manufacturers 1 (May 13, 2024), https://tinyurl.com/4n5e7mwb.

## II.    If the Dayton Area Chamber had lacked standing, the district court should have transferred the case to the Eastern Division of the Southern District of Ohio.

Because the Dayton Area Chamber has standing, there was no reason for the district court to dismiss or transfer this case. But if the Dayton Area Chamber *had* lacked standing, then the district court should have transferred this case to the Eastern Division of the Southern District of Ohio, where the Ohio Chamber of Commerce is located. Because "the presumption should be in favor of transfer," which serves judicial economy and promotes adjudication on the merits, dismissal is only "appropriate in unusual circumstances." 14D Wright & Miller, Federal Practice and Procedure Juris. § 3827 (4th ed.). The government does not dispute that, if the Ohio Chamber has standing, this case "could have been brought" in that venue. 28 U.S.C. § 1406(a). Nor does the government deny that transfer to that venue would have facilitated the "expeditious and orderly adjudication" of this case on its merits. Opening Br. 51 (quoting *Goldlawr, Inc. v. Heiman*, 369 U.S. 463, 466–67 (1962)). The government simply reiterates the district court's erroneous legal "conclusion that the Ohio Chamber, like the Dayton Chamber, lacks standing." Gov't Br. 50. And while the government assumes that the

district court's transfer decision is reviewed for abuse of discretion, the government does not deny that a venue determination based on a mistake of law is "review[ed] de novo." Opening Br. 53 (citing *1st of Mich. Corp. v. Bramlet*, 141 F.3d 260, 262, 264 (6th Cir. 1998)).

The government briefly suggests that dismissal, rather than transfer, was warranted because Plaintiffs "reasonably could have foreseen" that the district court would deem the Southern District of Ohio an improper venue. Gov't Br. 51 (quoting *Stanifer v. Brannan*, 564 F.3d 455, 460 (6th Cir. 2009)). But there was nothing remotely foreseeable about the district court's decision to cast aside binding precedent, question the very existence of associational standing, and reinvent the heretofore "modest" germaneness requirement. This case bears no resemblance to the facts of *Stanifer*, where "the plaintiff's attorney undoubtedly knew" that a different forum "was the correct one all along" and the plaintiff exhibited "'a complete lack of diligence in determining the proper forum in the first place.'" 564 F.3d at 460 (quoting district court's finding). Here, Plaintiffs had at the very least "some arguable basis for thinking that the action was properly brought in the district in

which it was originally filed," so "transfer rather than dismissal should [have] be[en] considered the default action." *Id.* at 459–60.

Finally, the government asserts that dismissal without prejudice, rather than transfer, was appropriate because the six-year "statute of limitations for claims against the government has not run" and Plaintiffs would thus not be barred from re-filing their complaint in another venue. Gov't Br. 52. But transfer under section 1406(a) does not require the plaintiff to demonstrate a statute-of-limitations problem. Rather, "by providing an equitable tool for avoiding, where fairly possible, the procedural impediments of improper venue and defects in personal jurisdiction, § 1406(a) reflects a fundamental policy favoring adjudications on the merits over dismissals." *Proctor v. Morrissey*, 97 F.3d 1448, 1996 WL 555302, at *5 (4th Cir. 1996) (per curiam) (citing *Porter v. Groat*, 840 F.2d 255, 257–58 (4th Cir. 1988)). While prejudice from the running of a statute of limitations can be an "especially compelling" factor favoring transfer, it is far from the only one, and even in the absence of such extenuating circumstances, "[d]istrict courts *also* are likely to order transfer rather than dismissal if it would be more efficient or economical to do so or if the plaintiff's belief that venue was

27

proper was in good faith and reasonable." 14D Wright & Miller, Federal Practice and Procedure Juris. § 3827 & nn. 35–36 (emphasis added) (collecting cases); *see, e.g.*, *Nw. Bldg. Components, Inc. v. Adams*, 2022 WL 1689293, at *6 (D. Colo. May 26, 2022) (transferring because it would be "'time consuming and justice defeating'" to "dismiss an action that could be brought elsewhere" (quoting *Goldlawr*, 369 U.S. at 467)); *Prospect Cap. Corp. v. Bender*, 2009 WL 4907121, at *6 (S.D.N.Y. Dec. 21, 2009) (citing "the desirability of expeditious litigation and concerns of judicial economy").

# CONCLUSION

For the reasons set forth above, this Court should reverse and remand for the district court to consider the merits of Plaintiffs' claims.

Respectfully submitted,

*/s/ Jeffrey S. Bucholtz*

| | |
|---|---|
| Jennifer B. Dickey | Jeffrey S. Bucholtz |
| Andrew R. Varcoe | Alexander Kazam |
| U.S. CHAMBER | Christine M. Carletta |
| LITIGATION CENTER | E. Caroline Freeman |
| 1615 H Street NW | KING & SPALDING LLP |
| Washington, DC 20062 | 1700 Pennsylvania Avenue NW |
| | Washington, DC 20006 |
| *Counsel for the Chamber of* | (202) 737-0500 |
| *Commerce of the United States* | jbucholtz@kslaw.com |
| *of America* | |

Tami H. Kirby
PORTER WRIGHT MORRIS
& ARTHUR LLP
One South Main Street
Suite 1600
Dayton, OH 45402
(937) 449-6721

*Counsel for Plaintiffs-Appellants*

March 14, 2025

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 32(a)(7)(B) and 6 Cir. R. 32(b), because it contains 5,471 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6). This brief has been prepared in a proportionally spaced typeface using Microsoft Word 365 MSO in 14-point Century Schoolbook font.

Date: March 14, 2025

*/s/ Jeffrey S. Bucholtz*
Jeffrey S. Bucholtz

*Counsel for Plaintiffs-Appellants*

## CERTIFICATE OF SERVICE

I hereby certify that on March 14, 2025, I electronically filed the foregoing document with the Clerk of the Court for the United States Court of Appeals for the Sixth Circuit by using the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

*/s/ Jeffrey S. Bucholtz*
Jeffrey S. Bucholtz

*Counsel for Plaintiffs-Appellants*